No. 24-2128

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

**UNITED STATES OF AMERICA,**
Plaintiff-Appellee,

v.

**JOEL RUIZ,**
Defendant-Appellant.

Appeal from the United States District Court
For the District of New Mexico
The Honorable David H. Urias
USDC NM No. 2:22-cr-365

_____

APPELLANT'S OPENING BRIEF

_____

Oral Argument Requested

Violet N. D. Edelman
Attorney for Appellant
Assistant Federal Public Defender
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
violet_edelman@fd.org

March 14, 2025

TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

JURISDICTIONAL STATEMENT ......................................... 1

SUMMARY OF THE ARGUMENT ......................................... 1

ISSUES PRESENTED .........................................................4

RELEVANT FACTS ........................................................... 4

ARGUMENT .....................................................................21

  I.  THE DISTRICT COURT ERRED IN DENYING MR. RUIZ'S
     MOTION TO DISMISS THE IMPERMISSIBLY VAGUE
     INDICTMENT.................................................................21

    A.  Standard of Review.................................................... 21

    B. The exceptionally broad time frame alleged in the indictment
       precluded Mr. Ruiz from asserting a defense, violating his due
       process rights...................................................... 21

    C. The vague indictment places Mr. Ruiz at risk for
       Double Jeopardy ..................................................27

  II. THE DISTRICT COURT ERRED IN DENYING MR. RUIZ'S
     MOTION FOR A JUDGMENT OF ACQUITTAL ........................28

    A. Standard of Review....................................................28

    B. The government did not introduce any evidence to establish Mr.
       Ruiz's non-Indian status ...........................................29

  III. THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING
      AN *ALLEN* INSTRUCTION TO THE JURY ..............................34

    A. Standard of Review.................................................... 34

    B. The *Allen* instruction was impermissibly coercive........................34

CONCLUSION ....................................................................... 40

REQUEST FOR ORAL ARGUMENT ................................................. 40

CERTIFICATE OF COMPLIANCE WITH RULE 37(A) ...................... 41

LIST OF ATTACHMENTS

Judgment in a Criminal Case
    August 20, 2024 ................................................................. A1
Memorandum Opinion and Order
    August 31, 2023 ................................................................. A9
Jury Trial Transcript
    January 18, 2024 ............................................................... A15
Jury Trial Transcript
    January 19, 2024 ............................................................... A20

## TABLE OF AUTHORITIES

**Cases**

*Cole v. Arkansas*, 333 U.S. 196 (1948) ................................................. 21

*Fawcett v. Bablitch*, 962 F.2d 617 (7th Cir. 1992) ............................... 23

*Hamling v. United States*, 418 U.S. 87 (7th Cir. 1974) .................... 11, 23

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................... 22, 28

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ............................................ 35

*Oregon v. Kennedy*, 456 U.S. 667 (1982) ............................................. 27

*Russell v. United States*, 368 U.S. 749 (1962) ...................................... 22

*United States v. Austin*, 448 F.2d 399 (9th Cir. 1971) .......................... 22

*United States v. Blandin*, 784 F.2d 1048 (10th Cir. 1986) .................... 35

*United States v. Butler*, 904 F.2d 1482 (1990) ...................................... 34

*United States v. Castillo*, 140 F.3d 874 (10th Cir. 1998) ...................... 23

*United States v. Cornelius*, 696 F.2d 1307 (10th Cir. 2012) .................. 37

*United States v. Cotton*, 535 U.S. 625 (2002) ....................................... 29

*United States v. Cruikshank*, 92 U.S. 542 (1875) ............................. 21, 22

*United States v. Davis*, 436 F.2d 679 (10th Cir. 1971) ......................... 22

*United States v. Diaz*, 679 F.3d 1183 (10th Cir. 2012) .................... 29, 32

*United States v. Dinitz*, 424 U.S. 600 (1976) ....................................... 27

*United States v. Doe*, 572 F.3d 1162 (10th Cir. 2009) ......................... 21

*United States v. Dunmire*, 403 F.3d 772 (10th Cir. 2005) ...................... 28

*United States v. Dyba,* 554 F.2d 417 (10th Cir. 1977) ........................... 36

*United States v. Harris*, 940 F.2d 1539 (10th Cir. 1991) ................. 25, 26

*United States v. King*, 632 F.3d 646 (10th Cir. 2011) ........................... 28

*United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001) . 35, 36, 37, 38

*United States v. McKinney*, 822 F.2d 946 (10th Cir. 1987) .................... 35

*United States v. Mueli*, 8 F.3d 1481 (10th Cir. 1993) ........................... 39

*United States v. Nunez*, 668 F.2d 10 (1st Cir. 1981) ............................ 23

*United States v. Olea-Monarez*, 908 F.3d 636 (10th Cir. 2018) ............. 34

*United States v. Poole*, 929 F.2d 1476 (10th Cir. 1991) ........................ 21

*United States v. Porter*, 881 F.2d 878 (10th Cir. 1989) .............. 36, 38, 39

*United States v. Prentiss*, 256 F.3d 971 (2001) ....................................... 29

*United States v. Prentiss*, 273 F.3d 1277 (10th Cir. 2001) .............. 30, 31

*United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008) ...................... 21

*United States v. Romero*, 136 F.3d 1268 (10th Cir. 1998) .......... 29, 20, 33

*United States v. Sells*, 477 F.3d 1226 (10th Cir. 2007) .......................... 28

*United States v. Simpkins*, 90 F.4th 1312 (2024) ........................... 29, 34

*United States v. Smith*, 857 F.2d 682 (10th Cir. 1988) ......................... 39

*United States v. Summers*, 414 F.3d 1287 (10th Cir. 2005) ................... 28

*United States v. Todd*, 446 F.3d 1062 (10th Cir. 2006) .................. 12

*Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005) ............................... 23

**Statutes and Rules**

18 U.S.C. § 1152 ..............................................1, 3, 4, 15, 29, 30, 32, 34

18 U.S.C. § 2241(c) ...................................................................... 1, 4

18 U.S.C. § 2246(2)(D) ................................................................. 1, 4

18 U.S.C. § 3231 ........................................................................... 1

18 U.S.C. § 3742 .......................................................................... 1

28 U.S.C. § 1291 ........................................................................... 1

Federal Rule of Appellate Procedure 4(b)(1) ........................................ 1

Federal Rule of Criminal Procedure 7 .................................... 5, 8, 10, 12

Federal Rule of Criminal Procedure 12.1 ............................................ 24

**Other Authorities**

Dagmar Wernitzing, Europe's Indians, Indians in Europe: Appropriations of Native American Cultures from Pocahontas to the Present (2007) ...................................................................... 32

History and Culture, https://www.tonation-nsn.gov/history-culture/ (last visited Mar. 4, 2025) ..........................................................................

Tribal Enrollment Process, https://www.doi.gov/tribes/enrollment (last visited Mar. 7, 2025) ...................................................................... 32

**Statement Regarding Prior or Related Appeals**

There are no prior or related appeals in this case

## JURISDICTIONAL STATEMENT

The United States District Court for the District of New Mexico had jurisdiction over this matter under 18 U.S.C. § 3231.  Mr. Ruiz was charged with two counts of 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(D).  R1.22-23.[1] Mr. Ruiz was convicted by a jury of the first count and acquitted of the second count on January 19, 2024. R5.616. Mr. Ruiz was sentenced on August 20, 2024. R5.603. He timely field this Notice of Appeal on August 29, 2024. R1.741.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, 18 U.S.C. § 3742, and Federal Rule of Appellate Procedure 4(b)(1).

## SUMMARY OF THE ARGUMENT

Mr. Ruiz was charged in a two-count indictment with two discrete instances of engaging in a sexual act with a minor under the age of 12 within an aggregate seven-year period.  At trial, he was convicted of count

---

[1] Citations will take the following form: "R1.1" with "R1" indicating the volume of the record on appeal, and ".1" indicating the page number of that volume of the record on appeal. In all volumes, the latter number is the number that appears in the bottom right corner of the record on appeal. For digital readers, numbers also correspond with the .pdf page number of the referenced volume.

one and acquitted of count two. The district court committed three errors, each of which requires reversal of Mr. Ruiz's conviction.

First, the district court erred in denying Mr. Ruiz's motion to dismiss the indictment for insufficient specificity. The time frame alleged in the indictment was so expansive that it inhibited Mr. Ruiz's ability to mount a defense and fails to protect him against double jeopardy. While an indictment need not allege dates with exact precision, the four- and three- year time frames in this indictment exceed the outer bounds of reasonableness. The notice requirement for indictments exists to ensure an accused can adequately defend against their case. Here, the indictment's vagueness obviously interfered with Mr. Ruiz's ability to do just that—it was undisputed that Mr. Ruiz was only intermittently present in New Mexico during the years in question. Had the indictment set forth a more specific period, Mr. Ruiz might have been able to present an alibi against the charged conduct. But with no sense of the season, much less the particular year, during which the crimes might have occurred, any such alibi was inaccessible to him. Moreover, because it is not clear when the single instances with which he was charged and acquitted, respectively, occurred, it is quite possible he could be charged

and tried again for the same conduct, under the guise of prosecution for a distinct incident within the same period. The vague indictment thus also runs afoul of the double jeopardy clause.

Second, the district court erred in denying Mr. Ruiz's motion for a judgment of acquittal based on insufficiency of the evidence. The government failed to introduce any evidence tending to establish Mr. Ruiz's non-Indian status—an essential element of the crime under 18 U.S.C. § 1152. The only evidence the government put forth to establish this element was the fact that Mr. Ruiz was born in Mexico. But his birthplace cannot prove anything about his Indian status or lack thereof. Because the government failed to produce any evidence pertaining to this element, the evidence was insufficient as a matter of law to establish Mr. Ruiz's guilt.

Third, the district court abused its discretion in issuing a modified *Allen* instruction. The timing of the instruction, when the jury reached an apparent impasse seven hours into deliberations on a Friday afternoon, together with the court's decision to send them immediately back to deliberations, gave it coercive effect.

## ISSUES PRESENTED

I.   Whether the district court erred in denying Mr. Ruiz's motion to dismiss the indictment as impermissibly vague where the unprecedented 4-year and 3- year periods alleged precluded Mr. Ruiz from presenting an alibi defense and place him at risk of double jeopardy.

II.  Whether the district court erred in denying Mr. Ruiz's Rule 29 motion for a judgment of acquittal where the government relied exclusively upon his birthplace in Mexico to prove his non-Indian status.

III. Whether the district court abused its discretion in issuing a modified *Allen* instruction when the jury reached an impasse seven hours into their deliberations.

## RELEVANT FACTS

On March 8, 2022, Mr. Ruiz was charged with two counts of violating 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(D). R1.22. The indictment alleged that he was a non-Indian who engaged in and attempted to engage in a sexual act with Jane Does 1 and 2, respectively, Indian children who were under the age of 12 at the time. R1.22. Count one (Jane Doe 1) set forth a four-year time span, alleging that the conduct occurred between January 27, 2016 and January 27, 2020. R1.22. Count two (Jane Doe 2) set forth a three-year time span, from February 13, 2013, to February 13, 2016. R1.22.

*Motion to Dismiss*

Before trial, Mr. Ruiz filed a motion to dismiss the indictment for failure to provide fair notice of the charges against him and to protect him from double jeopardy. R1.56. He argued that the indictment, which alleged that the conduct occurred within an aggregate seven-year period, lacked adequate specificity, thereby hindering his ability to present an effective defense. R1.59. In light of this ambiguity, he argued that acquittal on either count would not preclude the government from prosecuting him again with a narrower or different period. R1.64-65.

At a motions hearing on July 12, 2023, Mr. Ruiz emphasized the expansive nature of the four- and three- year time frames alleged in the indictment. R5.28. He highlighted that the specific dates demarcating the outer bounds of the time frames (January 27th and February 13) appeared to be arbitrary. R5.28-29. He argued that the vague time-period inhibited Mr. Ruiz's ability to identify an alibi or relevant witnesses. R5.30.

The court stated that Federal Rule of Criminal Procedure 7, which pertains to indictments, "doesn't seem to require a specific date . . . in fact, it basically just says that an indictment that sets forth the words of

the statute is generally sufficient." R5.33. Given this "plain reading of the rule[,]" it asked "why isn't that the case here? . . . [W]hy wouldn't the indictment be sufficient under the rule?" R5.33. The court also noted that the time period is not an element of the offense. R5.35. Mr. Ruiz emphasized again the abnormally broad time span, framed by arbitrary dates. R5.33.

The Court turned to the government, acknowledging that Mr. Ruiz's points were "compelling," particularly because he "can't present an alibi", "can't identify particular witnesses", "won't be able to say, wait a minute, the trailer didn't even exist at that time", and "[these are all things that seem, to me, to be important parts of the defendant's constitutional right to a fair jury trial." R5.36-37.

The government explained that the date ranges were selected based on the victims' respective birthdays. R5.37-38. The government pointed to information contained in forensic interviews of the victims, where "Jane Doe 2[2] says it happened until I turned seven years old. So she would have turned seven years old in 2019. And so we have an extra date

_____

[2] Based on its subsequent discussion, the government appears to have been referring to Jane Doe 1.

going until she's eight." R5.38.  The government continued, "Jane Doe 1 says that this happened when she was in first grade. Jane Doe 1 further reports as part of this forensic interview that this happened in the middle of summer break, which is consistent with her disclosure, that she was in first grade. Summer breaks happen when you're in school." R5.38.

The court asked, "Why wouldn't the indictment then have said that the incident is thought to have occurred on our about, and then give the three-month range of the summer vacation during her first grade year?" R5.39. The government attempted to explain, "Because, Your Honor, she stated in her forensic interview that it happened until she was seven, and that she thought it was about first grade, and so she was unclear. So the United States chose to include a range in the indictment and to develop that testimony further at trial and to tighten those timelines at trial, because a variance in which the narrowing of the scheme of the indictment is not prejudicial to the defendant at trial." R5.39.

The court asked why it would be necessary to wait until trial to narrow the time frames, given that "there would have been ways to determine a more specific time range, as you just stated." R5.39. The court again pointed out that if Jane Doe 1 remembered the events

occurring when she was in first grade over the summer, the indictment could have set forth a three-month time frame. R5.39. The government stated that it used the information available to it at the time of the indictment in making a charging decision, which it felt complied with the requirements of Rule 7. R5.40. It characterized the indictment as a "notice of proceeding – a notice of filing[.]" R5.40.

The court countered:

> This is more of a due process issue. This is more of an issue having to do with Mr. Ruiz's constitutional rights to a fair trial. It's not just about the form of the indictment. This goes to a much more serious concern and that is: How does he defend against something when he doesn't know specifically when it is alleged to have occurred.

R5.40. The court continued, "I find compelling this idea that he can't go back and say, wait a minute, that could not have occurred because I was in Colorado for six months, and then he proves that. He can't do that because he doesn't know what time frame you're talking about." R5.40-41.

The government responded that, in its view, Mr. Ruiz was "on notice and he has been provided sufficient notice about what act to defend against." R5.42. It also stated that he was protected by double jeopardy

because the government could not go back and charge other acts in the same time period with the same victims. R5.42. The court pointed out again that Mr. Ruiz did not live on the property in question for the duration of the alleged period, asking "if he was off and on, then wouldn't it be important for him to know when these incidents that are alleged to have occurred, when they actually occurred?" R5.42. The court added "I do understand there's plenty of information here that he's been provided regarding who the alleged victim is, who's making the allegation. He has plenty of information about where it happened, how it happened, but what he doesn't know, and I think it's key, is generally when it happened." R5.42. This, the court reasoned, deprived him of the opportunity to present an alibi. R5.42-43. The government argued, "certainly he's free to present an alibi defense." R5.43. The court asked how he could do so with such a broad time frame. R5.43. The government offered that the "underlying discovery provides Mr. Ruiz enough notice to at least try to defend against these allegations[.]" R5.43-44. The court asked again why the government had not identified a narrower time frame itself based on that discovery. R5.44.

When the government repeated that it felt the indictment met the requirements of Rule 7, the court agreed that the form of the indictment was probably sufficient, but explained it was concerned about "how that affects his due process rights beyond just the form[.]" R5.44-45. The government argued that "time is really not an element of the offense" and alluded to Tenth Circuit case law holding that "if there is a date range that is alleged, as long as the government is within a certain time frame, I believe it says weeks, then that is sufficient[.]" R5.45.

The court requested supplemental briefing on the question "whether or not there's any case law out there regarding this specific issue, which is not just the form of the indictment, but also sort of the breadth of the time frame that's alleged[.]" R5.46.

Mr. Ruiz filed the requested supplemental brief in support of his motion to dismiss on July 24, 2023. R1.242. Mr. Ruiz acknowledged that courts have tolerated "fairly large time windows" in addressing the constitutionality of charging instruments in the prosecution of child abuse cases. R1.243. He also acknowledged a dearth of case law presenting factually analogous circumstances to his case. R1.244. Even so, he pointed to case law discussing the reasonable limits for time frames

10

encompassing alleged criminal conduct. R1.244. He also outlined the pertinent differences between child abuse cases with some ambiguity in the alleged time frame and that alleged in this case, which for each count was well over double the time frames in other cases. R1.245-47; 250. He explained that courts that have conducted an objective inquiry into whether the charge enables the accused to mount an adequate defense in assessing the adequacy of time frames set forth in an indictment. R1.248 (citing *Hamling v. United States*, 418 U.S. 87 (7th Cir. 1974)). He pointed out that none of the discovery the government alluded to during the hearing provided any further clarity on the time frame, and that, in contrast to some other cases, the dates chosen had no connection to any temporal reference point articulated by the victims. R1.253.

Mr. Ruiz also reiterated the risk of double jeopardy presented by the vague indictment. R1.255. Specifically, he highlighted that each count alleged only one instance of abuse, though Jane Doe 1 mentioned many instances in her forensic interview. R1.256. Because the United States charged only a single act, without any reference to determine when it occurred, the vagueness placed Mr. Ruiz at risk for double jeopardy. R1.257.

In its response, the government outlined the requirements of Federal Rule of Criminal Procedure 7. R1.262-263. It posited that the indictment contained sufficient information to put Mr. Ruiz on notice, and that, because it included a time frame, enabled him to assert a double jeopardy defense. R1.262. The government asserted that "the grand jury in this matter upheld his due process right" by returning an indictment charging the alleged offense conduct within the windows set forth. R1.263. This, it said, was enough to "call for the trial of the charge on the merits." R1.264. It also emphasized case law describing the requirement that the alleged conduct occur "reasonably near to the specified date" in the indictment. R1.265. The government averred that it "expect[ed] the testimony regarding the time frames for the abuse to fall within the time frames alleged in the indictment." R1.266.

The district court denied the motion to dismiss on August 31, 2023. R1.362. The court noted that "[a]n indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." R1.364 (citing *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006)). It also pointed out that the time or

date of an offense is not an essential element, absent an express statutory provision to the contrary. R1.364. In light of the dearth of case law directly on point, the district court concluded that the indictment was sufficient. R1.365.

*Motion for a Judgment of Acquittal*

Jicarilla Apache Police Department Criminal Investigator Rome Wager testified at trial. R5.168. The government asked him if, during the course his investigation, he took "any steps to determine whether Joel Ruiz was enrolled as an Indian of any federally recognized tribe." R5.191. CI Wager answered, "no." R5.191. The government next asked if he "review[ed] any databases to determine whether Joel Ruiz was a member of any federally recognized tribe," to which he responded, "yes." R5.191. He testified that he reviewed the National Crime Information Center (NCIC) database to determine whether Mr. Ruiz was a member of a federally recognized tribe. R5.191. He learned, from his review of the database, that Mr. Ruiz was born in Mexico. R5.193. He testified that he spoke to an agent from the Department of Homeland Security, and that his search did not turn up any information indicating Mr. Ruiz was an Indian. R3.194.

FBI Special Agent Piere Robert Himel also testified at trial. R5.366. He explained that, generally, when evaluating whether a suspect is non-Indian, his agency will "just ask whether they're enrolled members of a tribe. And we can query their names with various tribes, and if they're not on the enrollment records, they wouldn't be a member of that tribe." R5.375. When the government asked if he ever reviewed law enforcement databases to determine Indian status, Agent Himel said "[g]enerally law enforcement databases don't have that information and – they may on occasion, but generally it's something you have to ask the individual about and then follow-up with the local enrollment office." R5.375. He continued, "[i]f we don't find anything, they wouldn't be considered a member of a federally-recognized tribe." R5.375.

The government asked if he reviewed "the Defendant's identifiers and photograph in this case[.]" R5. 385. He confirmed that he did, and reviewed "additional information" from a "government agency" that "contain[ed] identifiers and additional photographs of the Defendant[.]" R5.385. He testified that based on his review of "documents that Joel Ruiz signed[,]" he concluded that "Mr. Ruiz is a non-Indian." R5.390. On

cross examination, he testified that this was "partly" based on his determination that Mr. Ruiz was born in Mexico. R5.392.

At the conclusion of the government's case, Mr. Ruiz moved for a judgement of acquittal under Federal Rule of Criminal Procedure 29. R5.475. He argued that the government did not introduce sufficient evidence to prove Mr. Ruiz's non-Indian status, as required for conviction under 18 U.S.C. § 1152. R1.685-694; R5.475. He emphasized that CI Wager and SA Himel's testimony showed only that Mr. Ruiz was not a member of the Jicarilla tribe[3] and that he was born in Mexico, which is not enough to prove that he lacks any tribal affiliation. R1.692; R5.480, 483.

The government argued that "if he's a Mexican Citizen, it doesn't appear that he, you know, had any bloodlines that would make him – you can make a reasonable inference that there aren't any bloodlines that

---

[3] Mr. Ruiz made these arguments from memory and based on notes taken during trial, without access to transcripts. Counsel for Mr. Ruiz explained, "I believe we heard testimony from CI Wager that he checked the Jicarilla Apache rolls." R5.483. CI Wager does not appear to have testified to checking any Jicarilla Apache tribe rolls – when the government asked if he took any steps to determine whether Mr. Ruiz was enrolled in a federally recognized tribe, he simply said "no." R5.191.

would make him a member of a federally-recognized tribe in the United States." R5.485-86.

The court pointed out that a person with tribal status could easily also be born in Mexico, offering the following hypothetical: "Let's just say his family was Native American from a federally-recognized tribe in America, and at some point, some members moved to Mexico and that's where he was born." R5.486. Since, under these circumstances, he could still have tribal status, the court stated, "I don't see the fact that he was born in Mexico to be dispositive of the issue unless you know something that I don't know." R5.486.

The government pivoted, stating, "We heard testimony from Rome Wager that he was familiar with the Defendant, that he recognized the Defendant as someone who lived in the community, that the Defendant was not a member of the Jicarilla Apache Nation despite living there[.]" R5.486.[4] The court countered that the alleged victims also were not members of that tribe, suggesting that a lack of association with the Jicarilla Apache tribe could not be dispositive. R5.486. The government

---

[4] As noted above, Rome Wager did not testify that Mr. Ruiz was not a member of the Jicarilla Apache Nation. R5.191.

pointed to Agent Himel's testimony that he concluded Mr. Ruiz was a "non-Indian for purposes of federal law" based on his training and experience. R5.489. The court clarified, "So you're saying that [] all the government has to do is present an FBI agent to say, [b]ased on my experience and my experience as an FBI agent and looking at certain documents, I establish that he was a non-Indian." R5.489. The government said it thought that was sufficient. R5.489.

The court denied Mr. Ruiz's motion for a judgment of acquittal. R5.550. The district court based its ruling on its belief that Rome Wager testified that he was "familiar with the Jicarilla Apache tribe" and "based on his personal knowledge, the Defendant was not a member of the tribe." R5.550. The court further stated that CI Wager "testified that he checked the tribal rolls and determined that Mr. Ruiz was not a member of the tribe and, therefore, was non-Indian." R5.550.

Allen *Instruction*

The jury began deliberating at 2:53 PM on Thursday, January 18, 2024. R5.596. The next afternoon the jury submitted a note asking, "If we are divided on our decided votes and are not going to come to the conclusion of guilty, not guilty, are we a hung jury because we cannot

17

come to a definite decision?" R5.605. The court told the parties it was considering giving a modified *Allen* Instruction from the Tenth Circuit pattern criminal jury instructions. R5.605.

Mr. Ruiz objected to the *Allen* instruction because "[a]t this point, they've been deliberating, between yesterday, about seven [hours]. This seems pretty clear to us that their further deliberation isn't going to make a difference and the *Allen* instruction, even the modified one, is, in our opinion, unduly coercive and suggests that they need to come back and reach some sort of verdict." R5.605.

The court responded, "I'm not as convinced that they've been working hard or long enough to see whether or not they are truly deadlocked." R5.606. The court continued,

> The modified *Allen* instruction, of course, tries to remind the jury of the burden of proof. I think it also does a pretty good job of trying to keep things neutral and asks those who believe the Government has proved their case to review, again, their opinion based on the others, and also for those who feel that the Government has not proved their case, that they reconsider. So it tries to remain neutral and I think it does a pretty good job of that. It tries, also, to use the language that is not meant to rush or pressure them into reaching a verdict. I think giving it once is probably appropriate in this case.

18

R5.606.

The court and the parties agreed to omit the second paragraph of the pattern instruction, which details that a person could be tried again in the absence of a verdict. R5.606-612.

The jury returned, and the court gave the modified *Allen* instruction as follows:

> I'm going to ask that you return to the jury room and deliberate further. I realize that you are having some difficulty reaching a unanimous agreement, but that is not unusual. Sometimes, after further discussion, jurors are able to work out their differences and agree.
>
> You are reminded that the Defendant is presumed innocent and that the Government, not the Defendant, has the burden of proof and it must prove the Defendant guilty beyond a reasonable doubt. Those of you who believe that the Government has proved the Defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough given that other members of the jury are not convinced. And those of you who believe that the Government has not proved the Defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt.
>
> In short, every individual juror should reconsider his or her views. It is your duty, as jurors, to consult with one another and deliberate

with the view toward reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself but only do so after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry.

So I will now ask that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given you.

R5.612-614.

After receiving the instruction, the jury deliberated for just about two hours, until 4:55 PM. It found Mr. Ruiz guilty of count 1, and not guilty of count 2. R5.616.

On August 20, 2024, Mr. Ruiz was sentenced to prison term of 30 years, to be followed by ten years of supervised release. R5.651.

Mr. Ruiz timely filed notice of this appeal. R1.741.

ARGUMENT

## I. THE DISTRICT COURT ERRED IN DENYING MR. RUIZ'S MOTION TO DISMISS THE IMPERMISSIBLY VAGUE INDICTMENT.

### A.    Standard of Review

This Court reviews the sufficiency of an indictment de novo. *United States v. Doe*, 572 F.3d 1162, 1173 (10th Cir. 2009) (citing *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008)). "An indictment is sufficient if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert [a double jeopardy defense.]" *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir. 1991).

### B.    The exceptionally broad time frame alleged in the indictment precluded Mr. Ruiz from asserting a defense, violating his due process rights.

It is axiomatic that "[i]n criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right to be informed of the nature and cause of the accusation." *United States v. Cruikshank*, 92 U.S. 542, 557-58 (1875); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among

21

the constitutional rights of every accused in a criminal proceeding in all courts[.]"); *Jackson v. Virginia,* 443 U.S. 307, 314 (1979). Thus, "[t]he indictment must set forth the offen[se] with clearness and all necessary certainty, to apprise the accused of the crime with which he stands charged; and every ingredient of which the offen[se] is composed must be accurately and clearly alleged." *Cruikshank,* 92 U.S. at 558. It is the indictment's purpose to "furnish the accused with such a description of the charge against him as will enable him to make his defen[se], and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause[.]"*Id.*; *See Russell v. United States,* 368 U.S. 749, 763-64 (1962). This means that an indictment must provide "reasonable particularity of time[.]" *Cruikshank,* 92 U.S. at 557.

Generally, an indictment need not specify the exact dates on which the conduct is alleged to have occurred. *See United States v. Davis,* 436 F.2d 679 (10th Cir. 1971) ("the time or date an offense is committed is not an essential element of an offense unless the statute makes it so); *United States v. Austin,* 448 F.2d 399 (9th Cir. 1971) ("Generally, exact dates are not required so long as they are within the statute of limitation . . . and no prejudice is shown."). But the time frame included must be reasonable.

*See, e.g., United States v. Nunez*, 668 F.2d 10, 12 (1st Cir. 1981) (An indictment setting forth a one-year period is "reasonable"); *United States v. Castillo*, 140 F.3d 874, 885 (10th Cir. 1998) (proof of a date "reasonably near" specified date is sufficient).

Given the difficulty children might experience in recalling precise dates, courts have tolerated larger time frames for child sex abuse cases. *See Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005). But this relaxed standard does not eliminate the baseline reasonableness requirement. Most important, regardless of the type of charge, "[d]ue process means notice and an opportunity to respond. Notice must be sufficient to make the opportunity useful." *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992). This, in turn, means courts must evaluate whether "the charge enable[d] an innocent accused to mount an adequate defense[.]" *Id.* (*citing Hamling v. United States*, 418 U.S. 87 (1974)). "That the prosecutor may have a hard time framing a charge that allows an adequate defense is no reason to cut down the protections accorded to suspects." *Id.*

The vast time frame alleged in this case prevented Mr. Ruiz from mounting an adequate defense, eviscerating his due process protections.

As the district court acknowledged, the four years covered by count one[5] seriously inhibited his ability to offer an alibi—a notable imposition in his case, where that defense may very well have been available to him otherwise. It was undisputed that he did not live on the relevant property full-time, residing intermittently in Colorado during the alleged time frame. R5.40-42. The government's assurance that the evidence offered at trial would cure the indictment's ambiguity does not rectify the due process violation at the outset. Mr. Ruiz could not possibly produce specific information to account for and adequately defend against the charges on each and every day—over 1,000 days total—covered by the indictment. Had the government offered a narrower period to start, Mr. Ruiz may well have been able to mount an alibi.[6]

---

[5] The time frames alleged for each count were impermissibly broad. Mr. Ruiz focuses on count one now because he was acquitted of count two at trial.

[6] Under Federal Rule of Criminal Procedure 12.1, Mr. Ruiz could have been required to provide notice to the government of his intent to present an alibi defense, including specific places he claims to have been at the time of the alleged offense and the name, address, and telephone numbers of each alibi witness. Fed. R. Crim. Pro. 12.1. Though this requirement would only have been triggered if the government first issued a written demand for notice, the government's decision not to do so in this case only underlines the impossibility of any such defense in light of the extraordinarily long time frame.

Though courts have tolerated some ambiguity or inaccuracy with respect to timing in indictments, those cases present a stark contrast to this one. For example, in *United States v. Harris*, the defendant was charged with sexual abuse of a child between August 15, 1985 and May 15, 1986. *United States v. Harris*, 940 F.2d 1539, 1991 WL 150864, *1 (10th Cir. 1991) (unpublished). The alleged 9-month time frame, which tracked with the defendant's wife's pregnancy, was already significantly narrower than the four years alleged here. Furthermore, at a motion to dismiss hearing in *Harris*, the government clarified that the offense occurred "in the first part" of the pregnancy and that "the victim was seven when the incident occurred." *Id.* In other words, the government pinpointed a finite months-long span, with a significant and memorable temporal landmark. On appeal, this Court agreed with the defendant that "there must be some specificity given to the defendant so as to allow him to properly prepare his defense." *Id.* This Court concluded that the "right was complied with" in that case because the government's clarification that the allegations occurred during the first part of the defendant's wife's pregnancy, and the fact that the child was born on May

16, 1986, "sufficiently fix the time the government contended the offense was committed." *Id.*

The time alleged in this case was not fixed by reference to any temporal landmark. The government stated that the time frames listed were chosen by reference to the victims' birthdays. R5.38. But their birthdates have no relationship to the allegations. The victims never described the abuse as occurring around or near a birthday. And to the extent that their birthdays are connected to their ages, the ages disclosed became irrelevant as a reference point because the government included in its window an entire year when Jane Doe 1 was eight years old, despite her statement that the event occurred until she was seven.

In contrast to *Harris*, the government provided no information at the hearing to cabin its sweeping range. Though discovery included a statement from Jane Doe 1's mother recounting Jane Doe's description of the event as occurring during the summer when she was in first grade, the government only doubled down on its expansive time frame when pressed by the court as to why it did not then allege a three-month time frame. R5.38. It insisted it would "tighten those time frames at trial," without explaining why it couldn't do what the court suggested pretrial.

R5.38. Promising to introduce evidence at trial does not cure the fundamental constitutional problem with the vague indictment, given its impact on Mr. Ruiz's ability to prepare a defense.

The time frame alleged in the indictment did not provide Mr. Ruiz of adequate notice of the charges against him and deprived him of the opportunity to mount a defense. The district court erred in denying Mr. Ruiz's motion to dismiss on this ground.

### C. The vague indictment places Mr. Ruiz at risk for Double Jeopardy.

"The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671-71 (1982) (citing *United States v. Dinitz*, 424 U.S. 600, 606 (1976)). Each count of the indictment charged a single instance of alleged abuse. R1.22; R5.250. But at one point, Jane Doe 1 accused Mr. Ruiz of engaging in the conduct 10 to 20 times. R1.95. Mr. Ruiz's conviction for count one encompasses one single instance of this conduct. Because the indictment covered such an expansive amount of time and provided no clarity as to when within that time frame the instance might have occurred, Mr. Ruiz could face another prosecution, and there would be no way to know whether it pertained to the same

conduct for which he has already been tried. And, while he was acquitted of count two, he could face prosecution again for the same offense should Jane Doe 2 allege additional instances of abuse. For this reason, the vague indictment places Mr. Ruiz at risk of double jeopardy.

II. THE DISTRICT COURT ERRED IN DENYING MR. RUIZ'S MOTION FOR A JUDGMENT OF ACQUITTAL.

### A. Standard of Review

This Court reviews de novo whether the government presented sufficient evidence to support a conviction. *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007). It reviews evidence in the light most favorable to the government, with deference to the jury's verdict. *Id.*; *United States v. King*, 632 F.3d 646 (10th Cir. 2011). In evaluating the sufficiency of the evidence, this court must "determine[e] whether a reasonable jury could find guilt beyond a reasonable doubt[.]" *United States v. Summers*, 414 F.3d 1287, 1293-94 (10th Cir. 2005); *Musacchio v. United States*, 577 U.S. 237, 243 (2016); *Jackson v. Virginia*, 443 U.S. 307 (1979). "A conviction cannot be sustained if obtained by piling inference on inference." *Id.* (Quoting *United States v. Dunmire*, 403 F.3d 772, 724 (10th Cir. 2005)).

**B. The government did not introduce any evidence to establish Mr. Ruiz's non-Indian status.**

"In a case in which the government contends that the victim is an Indian, the status of the defendant will determine whether the crime may be prosecuted under § 1152[.]" *United States v. Prentiss*, 256 F.3d 971, 978 (2001) (*overruled in part on other grounds by United States v. Cotton*, 535 U.S. 625 (2002)). In such cases prosecuted under § 1152, the non-Indian status of the defendant is an essential element of any crime, which the government must allege in the indictment and prove to the jury beyond a reasonable doubt. *Id.* at 980; *United States v. Simpkins*, 90 F.4th 1312, 1315 (2024). The government need not "bring forth tribal officials to disprove the victim was a member of their tribes[.]" *United States v. Diaz*, 679 F.3d 1183, 1187 (10th Cir. 2012). But the government is still required the prove that the defendant lacks Indian status and "certain types of evidence, by themselves, may not be sufficient." *Id.* For example, testimony about defendants' "names, appearance, speech, and [] that they did not grow up" on a particular pueblo does not "satisfy the complex legal definition of Indian Status." *United States v. Romero*, 136 F.3d 1268, 1274 (10th Cir. 1998). Even "the fact that a person is not a member of a particular pueblo does not establish that he or she is not an

Indian under § 1152." *United States v. Prentiss*, 273 F.3d 1277, 1283 (10th Cir. 2001) (citing *Romero*, 136 F.3d at 1274).

The evidence offered by the government to prove Mr. Ruiz's non-Indian status ultimately comes down to a single, irrelevant, fact: that Mr. Ruiz was born in Mexico. Though the government said Rome Wager testified that Mr. Ruiz was not a member of the Jicarilla Apache tribe, a careful review of the record reveals that CI Wager provided no such testimony. R5.191. Indeed, when the government asked him if he took "any steps to determine whether Joel Ruiz was enrolled as an Indian in any federally recognized tribe," CI Wager said simply, "no." R5.191. The government then changed course, asking if he "review[ed] any databases to determine whether Joel Ruiz was a member of a federally recognized tribe." R5.191. CI Wager explained that he reviewed the NCIC database, from which he learned that Mr. Ruiz was born in Mexico. In other words, CI Wager's testimony about Mr. Ruiz's non-Indian status conveyed only that he determined Mr. Ruiz was born in Mexico. Based on this, he

testified that he did not "find any information that indicated Joel Ruiz was an Indian[.]" R5.194.[7]

Furthermore, Agent Himel's testimony cast doubt upon Rome Wager's approach. Agent Himel explained that "[g]enerally, law enforcement databases don't have [] information" about a person's Indian status. R5.375. He testified that "[g]enerally," he would "ask whether they're enrolled members of a tribe. And we can query their name with various tribes, and if they're not on the enrollment records, they wouldn't be a member of that tribe." R5.375. He did not testify, however, that anyone undertook any such investigation in Mr. Ruiz's case. He testified that his determination that "Mr. Ruiz is a non-Indian for purposes of federal law" was based on a "review of the documents that Joel Ruiz signed," – that is, his I-90—which indicated Mr. Ruiz was born in Mexico. R.5.388, 390, 392.

---

[7] Even if, *arguendo*, CI Wager had testified that he determined Mr. Ruiz was not enrolled in the Jicarilla Apache tribe, the government's evidence would still be insufficient. A person's lack of association with a single tribe cannot prove non-Indian status. *See Prentiss*, 273 F3d at 1283. The inadequacy of this evidence is underlined by the fact that the victims were not associated with the Jicarilla Apache tribe but instead had status through Caddo Nation in Oklahoma. R5.190.

In short, the evidence offered by the government to prove Mr. Ruiz's Indian status pertained only to his birthplace in Mexico. But, as the district court pointed out, Mr. Ruiz's birthplace is irrelevant to his tribal status. R5.486. Indian status does not depend on, or refer to, place of birth. "To find that a person is an Indian the court must first make factual findings that the person has some Indian blood and, second, that the person is recognized as an Indian by a tribe or by the federal government[.]" *See Diaz*, 679 F.3d at 1187; Tribal Enrollment Process, https://www.doi.gov/tribes/enrollment (last visited Mar. 7, 2025) ("Two common requirements for membership are lineal decadency from someone named on the tribe's base roll or relationship to a tribal member who descended from someone named on the base role . . . . Other conditions such as tribal blood quantum, tribal residency, or continued contact with the tribe are common."). A person born virtually anywhere in the world could meet these requirements and thus could have Indian status for purposes of § 1152.

Native Americans have lived outside of the United States, and even outside of North America, for centuries – indeed, since long before ratification. *See, e.g.*, Dagmar Wernitzing, Europe's Indians, Indians in

Europe: Appropriations of Native American Cultures from Pocahontas to the Present, 1-26 (2007). To assume that being born outside of the United States sheds any light whatsoever on Indian status is to assume that those with Indian status have never traveled from their ancestral homes – an assumption that is patently untrue.

In *Romero*, this Court made clear that the fact that someone did not grow up on a particular pueblo cannot establish their non-Indian Status, nor can "names, appearance, [or] speech[,]". *Romero*,136 F.3d at 1283. If that evidence is inadequate, the location where a person happens to have been born must be, too. A person's place of birth outside of tribal land or outside of the United States reflects even less upon their potential connection to a given tribe than does the place where they grew up.

And, even assuming, *arguendo*, that proximity between birthplace and federally recognized tribal land could have some bearing on tribal status, being born in Mexico cannot prove lack of tribal status because several federally recognized tribes span the United States/Mexico border. For example, the Tohono O'odham tribe has land in Mexico. *See* History and Culture, https://www.tonation-nsn.gov/history-culture/ (last visited Mar. 4, 2025).

Ultimately, Mr. Ruiz's birthplace in Mexico is immaterial to the question of his Indian status. The government thus offered no evidence tending to prove Mr. Ruiz's non-Indian status. Indeed, the court based its decision to deny Mr. Ruiz's motion for a judgment of acquittal on its mistaken belief that the government introduced additional evidence, after acknowledging that his birthplace alone would not suffice. R5.550. The government's failure to introduce evidence to satisfy this essential element of the crime requires reversal of Mr. Ruiz's conviction. *See Simpkins*, 90 F.4th at 1318 (reversing conviction under § 1152 in light of government's failure to introduce evidence of non-Indian status.).

III.  THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING AN *ALLEN* INSTRUCTION TO THE JURY.

### A.  Standard of Review

This Court reviews the district court's decision to give a supplemental jury instruction and to provide responses to questions from the jury for abuse of discretion. *United States v. Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018).

### B.  The *Allen* instruction was impermissibly coercive.

This Court has consistently and repeatedly "urged caution" in the use of *Allen* instructions. *United States v. Butler*, 904 F.2d 1482, 1488

(1990); *United States v. McElhiney*, 275 F.3d 928, 948 (10th Cir. 2001) ("exhorting a deadlocked jury to further deliberation-the classic *Allen* scenario-must be undertaken with great care."). "If the *Allen* instruction is given at all, it should be incorporated into the body of the court's original instructions to the jury. It should not be given during the course of deliberations." *United States v. Blandin*, 784 F.2d 1048, 1050 (10th Cir. 1986). "[A]lthough it is a preferred rule of procedure that an *Allen* instruction be given the jury at the same time as other instructions, it is not a per se rule." *United States v. McKinney*, 822 F.2d 946, 951 (10th Cir. 1987). This Court evaluates *Allen* instructions on a case-by- case basis, and "[t]he ultimate question [] is whether the *Allen* instruction was impermissibly coercive in a way that undermined the integrity of the deliberation process." *McElhiney*, 275 F.3d at 940. A coercive instruction constitutes a due process violation. *McElhiney*, 275 F.3d at 937 (citing *Mills v. Tinsley*, 314 F.2d 311, 313 (10th Cir. 1963)).

In assessing coerciveness, this court reviews the instruction given "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988). This Court has identified some factors relevant to its inquiry, including (1) the language of the instruction, (2) its

incorporation with other instructions; and (3) the timing of the instruction, including whether given before the jury has begun deliberations and whether given before the jury has reached an impasse. *United States v. Porter*, 881 F.2d 878, 888 (10th Cir. 1989); *McElhiney*, 275 F.3d at 940. "The colloquy between the judge and the jury foreman, [the] circumstances surrounding the giving of the instruction, and consideration of the American Bar Association Standards on Criminal Justice Relating to Trial by Jury may also be relevant." *McElhiney*, 275 F.3d at 940 (quoting *United States v. Dyba*, 554 F.2d 417, 421 (10th Cir. 1977).

In context, the *Allen* instruction, given apart from the rest of the instructions, seven hours into deliberations on a Friday afternoon and in response to an impasse, was coercive. First, that it was not included among the original jury instructions means that "the possibility of coercion becomes more likely." *McElhiney*, 275 F.3d at 942; R1.695-718; R5.554-567. An instruction given as part of the original instructions "is less likely to be coercive because (1) it does not stand out or receive particular emphasis and (2) it is given before the jury has reached a

deadlock." *McElhiney*, 275 F.3d at 942. Neither of these safeguards were present here.

The timing of the instructions in this case posed an acute threat of nearly a full week of trial and seven hours of deliberation. The jury, likely eager to wrap up deliberations and avoid extending its responsibilities into the following week, promptly returned its verdict at 4:55 PM. R5.615; *See, e.g., McElhiney*, 275 F.3d at 947 (noting that encouragement to complete deliberations by a certain time would provide a "strong argument that the jury was coerced" if the jury indeed returned a verdict within that time); *United States v. Cornelius*, 696 F.2d 1307, 1323 (10th Cir. 2012) (*Allen* instruction not impermissibly coercive in part because jury deliberated for several days afterwards, and the "relatively long period of further deliberation tends to negate an inference of improper coercion[.]").

Though the court opined that it was "not as convinced that they've been working hard or long enough to see whether or not they are truly deadlocked," R5.606, the jury's description suggests otherwise: it queried, "if we are not going to come to the conclusion of guilty, not guilty, are we a hung jury[?]" R5.605. Regardless of the amount of time the jury

37

deliberated for, the question indicates that they had reached an impasse. Without the instruction, they very well may have remained divided.

The jury's decision to convict Mr. Ruiz of one count and acquit him of the other suggests the instruction's prejudice. In its question to the court, the jury suggested that it was "divided." R5.605. It is quite possible, if not probable, that the jury's decision to split the indictment after receiving the *Allen* instruction reflects an alternative compromise it reached under the court's encouragement to return a verdict. *McElhiney*, 275 F.3d at 940 n.11 ("*Allen* charge analysis is always plagued by the fact that the coercive impact of an *Allen*-type instruction can almost never be proved, especially since the jury deliberation process is shielded from outside observation.")

While this Court has cautiously approved the use of an *Allen* instruction during deliberations in other cases, this case is distinguishable. *Allen* instructions given mid-deliberation have been appropriate where other facts mitigated, rather than aggravated, the coercive aspect of their timing. For example, in *Porter*, the instruction given mid-deliberation was also included in the initial instructions. *Porter*, 881 F.2d at 888. After the instruction was given again, the jury

38

assured the court that it would be able to reach a verdict with more time, which this Court said "indicates that they were not hopelessly deadlocked." *Id.* at 889; *United States v. Smith*, 857 F.2d 682 (10th Cir. 1988) ("The Tenth Circuit law permits the *Allen* Charge in toto to be given, though with caution, and preferable . . . before the jury has reached an impasse or deadlock). The court then excused the jury for the evening, "alleviat[ing] any sense of coercion." *Porter,* 881 F.2d at 888-89; *see also United States v. Mueli*, 8 F.3d 1481, 1487 (10th Cir. 1993) (instruction not coercive where "the court alleviated any potential coercion by allowing the jury to be excused until the following day.").

Here, the instruction was not included in the original jury instructions; the jury's question suggests that it was deadlocked, and, in any event, the court did not verify that it wasn't; and the court dismissed the jury to deliberate immediately after the instruction was given, near the end of the day on a Friday. In other words, none of the circumstances ameliorated the coercive effect of giving the instruction mid-deliberation, while some elements exacerbated it.

## CONCLUSION

For the reasons set forth above, Mr. Ruiz respectfully requests that this Court reverse his conviction.

## REQUEST FOR ORAL ARGUMENT

The legal and factual arguments in this case are sufficiently complex and unique that the decision process would be significantly aided by oral argument.

Respectfully submitted,


*/s/ Violet N. D. Edelman*
Attorney for Mr. Ruiz
Violet N. D. Edelman
Assistant Federal Public Defender
111 Lomas Blvd NW Suite 501
Albuquerque, NM 87102
(505) 346-2489
violet_edelman@fd.org

## CERTIFICATE OF COMPLIANCE WITH RULE OF APPELLATE PROCEDURE 32(A)(7)(b)

I, Violet Edelman, counsel for defendant-appellant Joel Ruiz, certify that this opening brief conforms to the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief uses a proportionally spaced 14- point type. Excluding table of contents, table of citations, request for oral argument and certificates of counsel, it contains 8,252 words. I relied on my word processor, Word Version 2016, to obtain the word count.

I certify that this certificate of compliance is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

 *s/  Violet Edelman*  
Attorney for Appellant

*United States v. Ruiz*

Tenth Circuit Court of Appeals

Case No. 24-2128

Attachment 1
Judgment in a Criminal Case
August 20, 2024

U.S. District Court
District of New Mexico
Case No. 2:22-cr-365

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
**District of New Mexico**

| | |
|---|---|
| UNITED STATES OF AMERICA | **Judgment in a Criminal Case** |
| V. | |
| **JOEL RUIZ** | Case Number:  **1:22CR00365-001DHU** |
| | USM Number:  **92942-509** |
| | Defendant's Attorney:   **Emily P. Carey** |

## THE DEFENDANT:

☐    pleaded guilty to count(s) .

☐    pleaded nolo contendere to count(s)  which was accepted by the court.

☒    was found guilty on count(s) **Count 1 of Indictment** after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 1152, 2241(c)  and 2246(2)(D) | Aggravated Sexual Abuse | 01/27/2020 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 .

☐  The defendant has been found not guilty on count(s) .

☐  Count(s)   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**August 20, 2024**
_____
Date of Imposition of Judgment

**/s/ David H. Urias**
_____
Signature of Judge

**Honorable David H. Urias**
**United States District Judge**
_____
Name and Title of Judge

**August 22, 2024**
_____
Date

A2

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 2 - Imprisonment

                                                                    Judgment - Page 2 of 7

DEFENDANT: **JOEL RUIZ**
CASE NUMBER: **1:22CR00365-001DHU**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:  **360 months** .

**The Court recommends the defendant participate in the Bureau of Prisons sex offender program.**

☒ The court makes the following recommendations to the Bureau of Prisons:
   **Englewood Federal Correctional Institution, Littleton, Colorado, if eligible**

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

     ☐   at  on .

     ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐   before 2 p.m. on .

     ☐   as notified by the United States Marshal.

     ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to

_____ at _____ with a certified copy of this judgment.

                                    _____
                                    UNITED STATES MARSHAL

          By _____
                                      DEPUTY UNITED STATES MARSHAL

A3

AO 245B (Rev. 09/19)      Judgment in a Criminal Case
                          Sheet 3 – Supervised Release                                                    Judgment - Page 3 of 7

DEFENDANT: **JOEL RUIZ**
CASE NUMBER: **1:22CR00365-001DHU**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:  **10 years** .

## MANDATORY CONDITIONS

1.   You must not commit another federal, state, or local crime.

2.   You must not unlawfully possess a controlled substance.

3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

     ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(Check, if applicable.)*

4.   ☐   You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5.   ☒   You must cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable)*

6.   ☒   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state, local, or tribal sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.   ☐   You must participate in an approved program for domestic violence. *(Check, if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.   You must answer truthfully the questions asked by your probation officer.

5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

A4

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, require you to notify that person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

14. You must undergo a sex offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary. You may be required to pay all, or a portion of the cost of the assessment.

15. You will waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer shall disclose the presentence report and/or any previous sex offender or mental health evaluations to the treatment provider.

16. You must submit to a search of person, property, residence, vehicles, documents, businesses, computers [as defined in 18 U.S.C. 1030(e)(1)], and other electronic communications or data storage devices or media effects, at any time, by a probation officer with reasonable suspicion concerning a violation of a condition of probation or supervised release, or unlawful conduct by the person, in the lawful discharge of the officer's supervision functions. You must inform any other occupants that the premises may be subject to searches pursuant to this condition. Failure to submit to a search may be grounds for revocation of supervision.

17. You will not have any direct or indirect contact or communication with the victim or his or her family, or go near or enter the premises where the victim or his or her family resides, is employed, attends school or treatment, except under circumstances approved in advance and in writing by the probation officer.

DNM 737

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
                         Sheet 5 – Special Conditions                                                    Judgment - Page 5 of 7

DEFENDANT: **JOEL RUIZ**
CASE NUMBER: **1:22CR00365-001DHU**

## SPECIAL CONDITIONS OF SUPERVISION

**You must comply with all Immigration and Customs Enforcement laws.**

**You must not use or possess alcohol. You may be required to submit to alcohol testing that may include urine testing, a remote alcohol testing system, and/or an alcohol monitoring technology program to determine if you have used alcohol. Testing shall not exceed more than 4 test(s) per day.  You must not attempt to obstruct or tamper with the testing methods. You may be required to pay all, or a portion, of the costs of the testing.**

**You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic cannabinoids, synthetic cathinones, etc.) that impair your physical or mental functioning, whether or not intended for human consumption.**

**You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program. You may be required to pay all, or a portion, of the costs of the program.**

**You shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer may disclose the presentence report, any previous mental health evaluations and/or other pertinent treatment records to the treatment provider.**

**You must reside in a residential reentry center for a term of (up to) 180 days.  You must follow the rules and regulations of the center.**

**You must not communicate, or otherwise interact, with the victim(s), either directly or through someone else without prior approval of the probation officer.**

**If recommended in the sex offense-specific assessment, you must begin attending and participating in sex offender treatment consistent with the recommendations of the evaluation.  You must follow the rules and regulations of that program. The probation officer, in conjunction with the treatment provider, will supervise your participation in the program (location, modality, duration, intensity, etc.).  Furthermore, you must submit to clinical polygraph examinations, as directed by the probation officer and/or treatment provider. You may be required to pay a portion or all of the cost of the assessments and treatment.**

**You are prohibited from viewing or possessing any material that depicts sexually explicit conduct as defined in 18 U.S.C. 2256, including images, books, writings, drawings, video games, or videos depicting actual sexual intercourse.  This also includes computer or computer-generated images or pictures, whether made or produced by electronic, mechanical, or other means.  Should the sex offense-specific assessment determine this factor is not a risk, then this condition shall not be enforced.**

**You must not have direct contact with children under the age of 18 years without written approval of the treatment provider in conjunction with the probation officer.  If you do have any direct contact with any**

A6

child you know or reasonably should know to be under the age of 18 years, including your own children, without the permission of the probation officer in conjunction with the treatment provider, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

You are restricted from engaging in an occupation where you have access to children without prior approval of the probation officer.

You must not go to or remain within 100 feet of school yards, parks, playgrounds, arcades, or other places used primarily by children under the age of 18years old.

You must not volunteer for any activities in which you supervise children or adults with mental or physical disabilities.

You must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You may be required to pay all, or a portion, of the costs of the program.

You shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer may disclose the presentence report, any previous substance abuse evaluations and/or other pertinent treatment records to the treatment provider.

You must submit to substance abuse testing to determine if you have used a prohibited substance. Testing shall not exceed more than 60 test(s) per year.  Testing may include urine testing, the wearing of a sweat patch, and/or any form of prohibited substance screening or testing. You must not attempt to obstruct or tamper with the substance abuse testing methods. You may be required to pay all, or a portion, of the costs of the testing.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

A7

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                         Sheet 6 – Criminal Monetary Penalties                                      Judgment - Page 7 of 7

DEFENDANT: **JOEL RUIZ**
CASE NUMBER: **1:22CR00365-001DHU**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

☐   The Court hereby remits the defendant's Special Penalty Assessment; the fee is waived and no payment is required.

| Totals: | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| | $100.00 | $0.00 | $0.00 | $ 0.00 | $0.00 |

☐   The determination of the restitution is deferred until .  An *Amended Judgment in a Criminal Case* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☒   In full immediately; or

B   ☐   $ due immediately, balance due (see special instructions regarding payment of criminal monetary penalties).

**Special instructions regarding the payment of criminal monetary penalties: Criminal monetary penalties are to be made payable by cashier's check, bank or postal money order to the U.S. District Court Clerk, 333 Lomas Blvd. NW, Albuquerque, New Mexico 87102 unless otherwise noted by the court. Payments must include defendant's name, current address, case number and type of payment.**

**The Court finds the Mandatory Restitution Act of 1996 is applicable in this case; however, no claim for restitution has been made by the victim(s) in this case. Therefore, none will be ordered.**

**Based on the defendant's lack of financial resources, the Court will not impose a fine or a portion of a fine. However, in accordance with U.S.S.G. 5E1.2(e), the Court has imposed as a special condition that the defendant reside at a residential reentry center. The Court concludes the total combined sanction without a fine or alternative sanction, other than the defendant reside at a residential reentry center, is sufficiently punitive.**

**The defendant is subject to the provisions of the Justice for Victims of Trafficking Act of 2015, which requires the Court to assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act (8 U.S.C. § 1324).  The Court finds the defendant is indigent and will not be required to pay the $5,000 assessment.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order:  (1) assessment,  (2) restitution principal,  (3) restitution interest,  (4)  AVAA assessment,  (5) fine principal,  (6) fine interest,  (7) community restitution,  (8) JVTA assessment,  (9) penalties, and  (10) costs, including cost of prosecution and court costs.

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

DNM 740

# *United States v. Ruiz*

Tenth Circuit Court of Appeals

Case No. 24-2128

Attachment 2
Memorandum Opinion and Order
Denying Defendant's Motion to Dismiss
August 31, 2023

U.S. District Court
District of New Mexico
Case No. 2:22-cr-365

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                                  No. 22-CR-365-DHU

JOEL RUIZ,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Ruiz's Motion to Dismiss ("Motion") (Doc. 50). The Government filed a Response in opposition (Doc. 58) to which Defendant filed a Reply (Doc. 68). The Court heard oral argument on the Motion on July 6, 2023. Following the hearing, the parties submitted supplemental briefs regarding the Motion (Docs. 77 and 82). The Court, having considered the briefs, relevant law, oral argument, and being otherwise fully informed, finds that the Motion should be **DENIED**.

I.      **BACKGROUND**

On March 8, 2022, a grand jury charged Defendant with two counts of Aggravated Sexual Abuse against Jane Doe 1 and Jane Doe 2, children who had not attained the age of twelve, in violation of 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(D). In the first count of the indictment, the Government charged Defendant with sexually abusing Jane Doe 1 between January 27, 2016 and January 27, 2020. In the second count, it charged Defendant with sexually abusing Jane Doe 2 between February 13, 2013 and February 13, 2016. The specific language of the indictment is as follows:

<u>Count 1</u>

Between on or about January 27, 2016, and January 27, 2020, in Indian Country, in Rio Arriba County, in the District of New Mexico, the defendant, JOEL RUIZ, a non-Indian, unlawfully and knowingly engaged in and attempted to engage in a sexual act with Jane Doe 1, an Indian child, who had not then attained the age of twelve (12) years, and the sexual act consisted of the intentional touching, not through the clothing, of the genitalia of Jane Doe 1, with an intent to abuse, humiliate, harass, degrade, and arouse and gratify the sexual desire of any person.

In violation of 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(D).

<u>Count 2</u>

Between on or about February 13, 2013, to February 13, 2016, in Indian Country, in Rio Arriba County, in the District of New Mexico, the defendant, JOEL RUIZ, a non-Indian, unlawfully and knowingly engaged in and attempted to engage in a sexual act with Jane Doe 2, an Indian child, who had not then attained the age of twelve (12) years, and the sexual act consisted of the  intentional touching, not through the clothing, of the genitalia of Jane Doe 2, with an intent to abuse, humiliate, harass, degrade, and arouse and gratify the sexual desire of any person.

In violation of 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(D).

Doc. 2 at 1-2.

According to the Government, the allegations underlying those charges include that Defendant (1) lured with candy Jane Doe 1 and Jane Doe 2 into a white travel trailer and then (2) sexually molested them by pulling their pants down and touching their genitals. This abuse occurred when no one else was around, and Defendant isolated Jane Does 1 and 2 from other family members on the property in order to perpetrate the abuse.  According to Defendant, neither Doe claims to have witnessed the assault of the other, nor do either contend that anyone else saw the alleged assault.

Defendant moves this Court to dismiss the indictment in this matter.  Defendant argues the indictment violates his right to due process because it does not give him fair notice of the charges against him, thereby impairing his ability to prepare and present an effective defense.  Doc. 50 at

A11

1-2. Furthermore, he argues the indictment precludes protection from another prosecution based on the same allegations. *Id.* at 2. The Government argues the indictment is sufficient. *See generally* Doc. 58.

## II.   ANALYSIS

Federal Rule of Criminal Procedure 7 states, "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7. "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)). If those three standards are met, then the indictment "need not go further and allege in detail the factual proof that will be relied upon to support the charges." *United States v. Doe*, 572 F.3d 1162, 1173–74 (10th Cir. 2009) (quoting *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008)). The indictment need only "quote[ ] the language of a statute and include[ ] the date, place, and nature of illegal activity." *Id.*; *Hamling v. United States*, 418 U.S. 87, 117–18, 94 S. Ct. 2887, 2907–08, 41 L. Ed. 2d 590 (1974) ("Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.") (internal citations omitted).

Moreover, "In the absence of an express provision in the statute, proof of the specific date of the crime is not an essential element so long as it is shown to have occurred after the prior conviction, within the statute of limitations, and before the indictment." *United States v. Francisco*,

575 F.2d 815, 818 (10th Cir. 1978). "The time or date an offense is committed is not an essential element of an offense unless the statute makes it so." *United States v. Davis*, 436 F.2d 679, 682-83 (10th Cir. 1971).

The Court finds that the Indictment in this matter is sufficient. The Court agrees with the Government that the counts of the Indictment adequately set forth the elements of the offenses charged and put Defendant on fair notice of the charges against which he must defend. Additionally, the language of the Indictment would enable him to assert a double jeopardy defense because, as the Government notes, the Government would "clearly [be] barred from later charging Defendant with sex crimes against Jane Does 1–2 that occurred within the same charging window as set forth in the Indictment." Doc. 58 at 5.

In his supplemental brief, Defendant notes that, "Despite extensive research, Mr. Ruiz could not identify any one case that was factually analogous to his own as it relates to his claim that the overbroad time frame in the indictment violates his right to due process." Doc. 77 at 3. Defendant also recognizes that in the context of child abuse prosecutions, courts have "found that fairly large time windows…are not in conflict with constitutional notice requirements." *Valentine v. Konteh,* 395 F.3d 626, 632 (6th Cir. 2005). Significantly, Defendant goes on:

> Mr. Ruiz recognizes that numerous courts have adopted the Sixth Circuit's proposition in *Valentine* that "fairly large time windows" may not conflict with constitutional notice requirements in child abuse prosecutions. Even so, analysis of these cases reveals that what is considered a "fairly large time window" is substantially less than the seven-year window with which Mr. Ruiz is now confronted. *See, e.g., Madden v. Tate,* 1987 WL 44909, at *1-*3 (6th Cir. 1987) (six months); *Parks v. Hargett,* 1999 WL 157431, at *4 (10th Cir. 1999) (seventeen months); *Fawcett v. Bablitch,* 962 F.2d 617, 619 (7th 1992) (six months); *Hunter v. New Mexico,* 916 F.2d 595, 600 (10th Cir. 1990) (three years).

Doc. 77 at 9. Although Defendant argues that the seven-year period of the indictment undermines his ability to prevent a defense, the Court notes that the Indictment's seven-year period is divided

into two separate periods as the two separate charges involve separate date ranges and separate children.  Specifically, Count 1 includes a four-year range and Count 2 includes a three-year range. Therefore, the timeframes provided in the Indictment are sufficient.  Given all of the above, the Court will deny Defendant's Motion to Dismiss.

**IT IS THEREFORE ORDERED** that Defendant Joel Ruiz's Motion to Dismiss (Doc. 50) is **DENIED**.

**IT IS SO ORDERED.**

DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

A14

# *United States v. Ruiz*

Tenth Circuit Court of Appeals

Case No. 24-2128

Attachment 3
Jury Trial Transcript
Denial of Defendant's Rule 29 Motion for a Judgment of Acquittal
January 18, 2024

U.S. District Court
District of New Mexico
Case No. 2:22-cr-365

Appellate Case: 24-2128   Document: 15-5   Date Filed: 11/04/2024   Page: 550   Restricted PAGE 400

It makes sense that that's the first thing that I do, is rule on the Rule 29 motion.  So the issue on a Motion for Judgment of Acquittal under Rule 29 is whether, taking the evidence, both direct and circumstantial, together with reasonable inferences to be drawn therefrom, in the light most favorable to the Government, a reasonable juror could find the Defendant guilty beyond a reasonable doubt.  Having considered the parties' motions, oral arguments, evidence, applicable law, and otherwise being fully advised, the Court will deny the Defendant's Motion for Judgment of Acquittal under Federal Rule of Criminal Procedure 29.

To find the Defendant guilty of counts -- to find him guilty under both Counts 1 and 2, the jury must be convinced that the Government has proved each of the following elements beyond a reasonable doubt.  And that's what I was looking for as I was trying to determine whether or not a Rule 29 motion should be granted in this case.  I think, first, with regard to whether Mr. Ruiz knowingly engaged in sexual acts with Jane Does 1 and 2, I think we heard sufficient testimony and evidence from the alleged victims themselves from which a jury could find beyond a reasonable doubt that Mr. Ruiz knowingly engaged in sexual acts with both of them.

I also feel that that same testimony from those individual alleged victims provided sufficient evidence that this occurred before they had attained the age of 12 years.

With regard to whether Jane Doe 1 and Jane Doe 2 were Indian,

Appellate Case: 24-2128   Document: 15-5   Date Filed: 11/04/2024   Page: 551   Restricted
PAGE 401

I believe we heard testimony from Ms. Leemhius, the enrollment director at the Caddo Nation of Oklahoma, which established that, based on the records of that tribe, both Jane Doe 1 and Jane Doe 2 were Indian.  And I think that that is sufficient evidence for that particular element of the Indictment -- both Indictments.

With regard to the fourth element that Mr. Ruiz is a non-Indian, again the standard is whether or not there could be a reasonable inference drawn in the light most favorable to the Government from the direct and circumstantial evidence.  And I find that there was sufficient evidence from which a jury could infer and reasonably infer beyond a reasonable doubt that Mr. Ruiz is a non-Indian.  We had the testimony of Rome Wager, the criminal investigator from Jicarilla Apache police, testifying he was familiar with Defendant Joel Ruiz, familiar with the Jicarilla Apache tribe and the people thereof, and he testified that his personal -- based on his personal knowledge, the Defendant was not a member of the tribe.  The criminal investigator also testified that he checked the tribal rolls and determined that Mr. Ruiz was not a member of the tribe and, therefore, was non-Indian.  He also testified that he checked government databases and confirmed the Defendant was born in a country outside the United States.

With regard to Special Agent Himel, I believe that testimony also was similar in regards to the agent testified that he checked several databases, governmental databases, which confirmed the Defendant was a citizen of a different country.  He also reviewed

government documents that were signed by the Defendant under penalty of perjury establishing that he was a citizen of a different country, and that there was no indication to him, at least in his review, that the Defendant was of -- was an Indian for purposes of this.

I understand that there are cases that say the burden is placed on the Government and the Government has to prove each element regardless of how difficult those elements may be to prove, but at the same time, cases like United States v. Diaz from the Tenth Circuit makes pretty clear that the Government did not have a duty to go through every possible tribe and get from each tribe official information regarding Mr. Ruiz in order to prove that he was non-Indian or to disprove that he was a member of that particular tribe.

In Diaz, the Tenth Circuit found it unnecessary to do so even when they were just talking about the tribes in New Mexico.  They found that it was hardly realistic, given the many tribes in New Mexico, to require the Government to do that.  I think in this case, it's even more unrealistic given that the Government would have to go through each and every tribe in the jurisdiction of the United States to determine with certainty that the defense seems to be requiring that he is a non-Indian.  So I think that was the bigger issue for the Court, and I think there's sufficient evidence to go forward on that.

The final element is the requirement that the Government show

the incident occurred in Indian Country within the District of New Mexico. I think we've heard sufficient evidence from witness Sandoval who is a realty specialist and custodian of official land records for the Bureau of Indian Affairs and from the Jicarilla tribe itself regarding his knowledge and his review of government documents that confirmed the address at issue here is within the exterior boundaries of the Jicarilla Apache tribe and, therefore, in Indian Country within the District of New Mexico.

So that is the Court's ruling on the Rule 29.

With regard to the proposed jury instructions, you've all been provided what appears or what we hope to be the final version. Mr. McGinley, have you had a chance to review that?

MR. MCGINLEY: Yes, Your Honor. I didn't find any issues with them. I think the order looks fine, and I also didn't catch any typos or anything.

THE COURT: Ms. Carey, did you have a chance to look through those?

MS. CAREY: I did, Your Honor, and I agree with Mr. McGinley. I had no concerns about them and appreciate the reordering, which was much better than what we had proposed.

THE COURT: All right. Great. Then we'll just go ahead and make the additional copies for the Members of the Jury. As I stated, I'm not going to give them the copies of the instructions until after they go to their deliberations, but we will have that ready. Do you want to do that?

# *United States v. Ruiz*

Tenth Circuit Court of Appeals

Case No. 24-2128

Attachment 4
Jury Trial Transcript
Modified *Allen* Instruction and Jury's Verdict
January 19, 2024

U.S. District Court
District of New Mexico
Case No. 2:22-cr-365

COURTROOM DEPUTY:  United States District Court for the District of New Mexico is in session, the Honorable David Herrera Urias presiding.

THE COURT:  Please be seated.

We have another note from the jury.  Juan is going to pass you a copy of the note, but I'll read it first.  It says, "If we are divided on our decided votes and are not going to come to the conclusion of guilty, not guilty, are we a hung jury because we cannot come to a definite decision?"  Signed by the jury foreman, XXXXX XXXXXXXXXXX, January 19th, 2024.

I'm inclined to bring them back in and give to them a modified Allen instruction from the Tenth Circuit's pattern criminal jury instructions.

MR. MCGINLEY:  We'd agree with that, Your Honor.

MS. CAREY:  Your Honor, we would object to an Allen instruction.  Sorry, we would object to an Allen instruction.  At this point, they've been deliberating, between yesterday and today, about seven years.  This seems pretty clear to us that their further deliberation isn't going to make a difference and the Allen instruction, even the modified one, is, in our opinion, unduly coercive and suggests that they need to come back and reach some sort of verdict.  I know it doesn't expressly say that, but that is the tone of the instruction.

THE COURT:  Understood.  I think it's important to give the instruction.  I'm not as convinced that they've been working

hard or long enough to see whether or not they are truly deadlocked.

One thing I will change -- one of the things I was going to do with regard to the modified <u>Allen</u> instruction is there's a sentence in here -- and I don't know if you guys have a copy of it or if you know the modified <u>Allen</u> instruction.

MS. CAREY:  I have copies, Your Honor.  Do you need one? I assume we're talking about the Tenth Circuit pattern instruction, Your Honor?

THE COURT:  1.42.

MS. CAREY:  Yes.

THE COURT:  The modified <u>Allen</u> instruction, of course, tries to remind the jury of the burden of proof.  I think it also does a pretty good job of trying to keep things neutral and asks those who believe the Government has proved their case to review, again, their opinion based on the others, and also for those who feel that the Government has not proved their case, that they reconsider.  So it tries to remain neutral and I think it does a pretty good job of that.  It tries, also, to use language that is not meant to rush or pressure them into reaching a verdict.  I think giving it once is probably appropriate in this case.  But in the second paragraph, it says, "This is an important case, if you should fail to agree on a verdict, the case is left open and must be tried again."  That's not necessarily a correct statement, correct?  It may be tried again, but it doesn't have to be tried

again.

MS. CAREY: Your Honor is correct. And I would say we still object, but if the Court is gonna move forward over our objection, we actually would ask the Court to take out the entire second paragraph because I think the entire thing is coercive. The Tenth Circuit in the McElhiney case says that the two things that the Tenth Circuit says must be in the instruction is the instruction about folks not giving up their beliefs -- consider other opinions but if they have firmly-held beliefs, not giving up those beliefs. And then a reiteration of the burden of proof. Anything that's in the second paragraph isn't required. And I think telling jurors, hey, we've spent so much money and time on this, if you don't reach a decision, it sort of says all this time has been wasted, and I think this entire paragraph is problematic.

THE COURT: You know, I never thought about that but I tend to agree with your thoughts on the second paragraph. I don't think it's necessary. I think the rest of it has pretty much laid out what's intended and what the Tenth Circuit actually requires.

MR. MCGINLEY: The United States would agree to modify it to "may," Your Honor, instead of "must be tried." But we disagree and would request the entire Allen charge be given from the Tenth Circuit. That is a consequence of a hung jury. We are saying "may," but it's --

THE COURT: But do you think the statement -- that paragraph -- I agree with both of you, really, in essence, except

that that second paragraph, the part about investing large amounts of time and effort and so forth, I'm not sure that's an appropriate consideration for them.  I think just reminding them of the burden of proof, reminding them that they can still consider changing their opinion, but then telling them also to -- if they have strong beliefs, to maintain them.  I think that's really what the point of the modified <u>Allen</u> instruction is, and I'm not sure that we need the second paragraph.

MR. MCGINLEY:  Your Honor, I would say that the Tenth Circuit thinks it's important.  That's why it's in the pattern instruction.

THE COURT:  Well, maybe.  The Tenth Circuit law that it's based on doesn't mention any of this.  That's what concerns me.  I'm not sure where that came from.

The cases itself, which ended up resulting in the modified <u>Allen</u> instruction, requires that the burden of proof be set forth, that there be a statement regarding, you know, holding on to your strong beliefs if that's what you want to do.  I forgot the third thing.  We were just looking at it.  But there's like three or four requirements.  And, obviously, I have the discretion to give whatever instruction I want, so long as I think it's appropriate.  And I would ask that you reconsider that second paragraph.  I really don't think it makes much of a difference.

MR. MCGINLEY:  Your Honor, we're gonna -- our position would be that we submit that to the jury.

THE COURT:  All right.  I just don't see the reason why we would.  Unless I hear some argument from you as to -- other than it's in the pattern jury instruction, if there's something that the Government believes is especially specific to this case where that would be necessary, I'd like to hear that.  Otherwise, I don't see it being entirely necessary.

MR. McGINLEY:  I'd request a few minutes, Your Honor.  We don't even know what the note is going to be.

THE COURT:  Please take a look at it.  I'd rather come to an agreement on this than have a dispute over it.  But you guys take a look at that, and we have some time.

MR. McGINLEY:  We also didn't bring -- do you mind if we step out of the courtroom for a moment, Your Honor?

THE COURT:  Go ahead.  That's fine.

MR. McGINLEY:  Thank you, Your Honor.

(In recess at 2:16 p.m. until 2:21 p.m.)

MR. McGINLEY:  Thank you, Your Honor.  I apologize for that.

THE COURT:  That's fine.

MR. McGINLEY:  For the delay.

Your Honor, the United States is -- the position we're going to take is, you know, the jurors, during jury selection, took an oath and they told us that they could come to a decision.  Indecision's not a decision, and we think that this is -- it is important that they know that not coming to a conclusion or

rendering a verdict or an acquittal has significant ramifications.

THE COURT:  Well, you're putting me in a tough spot here.  I could just declare the mistrial now as well.

Ms. Carey?

MS. CAREY:  Your Honor, we -- based, again, on the language from the note, it says, "If we are divided on our decided votes," which suggests to me that people have already made decisions where they stand.  I mean, we do object to moving forward with an Allen instruction, but if the Court desires to proceed that way, I think removing the part the defense believes is most prejudicial -- even the words that Mr. McGinley just used about -- in describing this paragraph about the significant consequences that calling a mistrial could have, I think, is unduly coercive.

And, again, in the McElhiney case, which is really the leading case which discusses the Allen instruction in the Tenth Circuit, it cites to cases that the Allen charge must be used with great caution.  It should be used only when absolutely necessary.  And what the Tenth Circuit requires is there's some language to the effect that no juror should yield his firmly-held conviction simply to reach an agreement, and a reminder that the burden of proof belongs to the Government, not the Defendant.  Nothing else is required and I don't believe that removing the second paragraph does anything to harm the intention of the instruction, and it removes what appears to be prejudicial, especially when we have --

especially when we're very objective at all -- we have objections with moving forward at all, but the note clearly says decided votes.  So that's our position.

MR. McGINLEY:  Your Honor, obviously, we'd prefer that a version of this be given, so...

THE COURT:  Well, I wish, you know --

MR. McGINLEY:  We will --

THE COURT:  Sometimes you have to sort of think about the ramifications of the way that you look at these things.  I just don't see how the second paragraph is that important to the United States.

MR. McGINLEY:  If I could rephrase what I'm saying, a version of this Allen charge, if that includes the second paragraph or not, the United States would prefer that an Allen charge be given.  It's just -- so we'll defer to the Court, Your Honor.

THE COURT:  You're okay with the modified Allen instruction without that second paragraph?

MR. McGINLEY:  If that's what the Court's going to do, Your Honor.

THE COURT:  Well, I'm going to do that if everybody agrees on that.  Obviously, they've made their objection to providing an Allen instruction at all.  I was inclined to go ahead and give the instruction, but I'd rather have some agreement, at least to what's in it.

MR. MCGINLEY:  We'll agree to the instruction, Your Honor.

THE COURT:  So we'll take that second paragraph out? Yes?

MR. MCGINLEY:  Yes, Your Honor.

THE COURT:  All right.  So that's what I'll do, Ms. Carey.  I do think -- again, I do think that a modified <u>Allen</u> instruction is important at this time.  I will give the modified <u>Allen</u> instruction but without the second paragraph.

MS. CAREY:  Understood, Your Honor.  Thank you.

THE COURT:  Mr. Gonzales, do you want to bring the jury in?

COURTROOM DEPUTY:  Yes, Your Honor.

THE COURT:  I always have to be careful about what we say here.  What we intend to say to the jury is that we have received their note, the Court has reviewed their note, and then try to get directly into the modified <u>Allen</u> instruction without saying much else.

MS. CAREY:  I think that's the safest way, Your Honor.

MR. MCGINLEY:  I agree, Your Honor.

(In the presence of the jury.)

THE COURT:  Please be seated.

Good afternoon, everyone.  I -- we are in receipt of the note that you have provided to the Court.  I'm going to ask that you return to the jury room and deliberate further.  I realize that

you are having some difficulty reaching a unanimous agreement, but that is not unusual.  Sometimes, after further discussion, jurors are able to work out their differences and agree.

You are reminded that the Defendant is presumed innocent and that the Government, not the Defendant, has the burden of proof and it must prove the Defendant guilty beyond a reasonable doubt. Those of you who believe that the Government has proved the Defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough given that other members of the jury are not convinced.  And those of you who believe that the Government has not proved the Defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt.

In short, every individual juror should reconsider his or her views.  It is your duty, as jurors, to consult with one another and deliberate with the view toward reaching an agreement if you can do so without violence to individual judgment.  Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of

returning a verdict.

What I have just said is not meant to rush or pressure you into agreeing on a verdict.  Take as much time as you need to discuss things.  There is no hurry.

So I will now ask that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given you.

Thank you.  Mr. Gonzales?  All rise for the jury.

(Outside the presence of the jury.)

THE COURT:  Anything further from the parties?

MR. McGINLEY:  And this is something I would ask the Court's discretion on.  Do we need to send a copy back, with this paragraph eliminated, with them, or is it just read on the record?

THE COURT:  It's read on the record.  What I will do is we will put together one.  We'll type one up that does not have the second paragraph, so that that we can file it and it can be in the record.  But we're not going to provide one to the jury. That's what I was asking Mr. Gonzales about a while ago.  He informed me we don't do that.  And I think the reason why is they would be looking at it and, you know, paying more attention to that rather than going back and deliberating and looking at the evidence.

What I intend to do, at around -- assuming that we don't hear from them this afternoon until late, I'll do the same thing we did

yesterday.  I'll ask that you-all be here at 4:45, and I'll call the jury in and ask if they want to continue deliberations past 5:00, or if they want to be excused until Monday morning to start again.  So if you-all could be back, unless -- well, unless you're called by us earlier, if you could all be back at 4:45, I'll meet you here in the courtroom.

MR. McGINLEY:  Thank you.

MS. CAREY:  Thank you, Your Honor.

THE COURT:  Court will be in recess.  Thank you.

(In recess at 2:32 p.m. until 4:55 p.m.)

THE COURT:  We have just received word that the jury has reached a verdict.  That's not what I had called you-all here for, so let me just get my stuff together here so we can take the verdict from the jury.

Court's going to call the case of United States of America v. Joel Ruiz, 22-CR-00365-DHU.

As I stated, the jury seems to have reached a verdict in this case, so we're going to have the jury brought in at this time.

Are they ready?

(In the presence of the jury.)

THE COURT:  Good afternoon, again, to all of you.  Let me ask first:  Which one of you has been chosen as the jury foreman?  All right.  You are, Mr. --

THE FOREPERSON:  XXXXXXXXXXX.

THE COURT:  Mr. XXXXXXXXX, has the jury unanimously

agreed on a verdict?

THE FOREPERSON:  Your Honor, we have.

THE COURT:  Can you please hand the verdict form to the courtroom security officer?

MS. CAREY:  And, Your Honor, we're having trouble with the interpretation equipment.  If we could have one moment, please?

THE COURT:  Sure.

Is your first name XXXXX?

THE FOREPERSON:  Yes.

MS. CAREY:  Your Honor, everything's back in order.  Thank you.

THE COURT:  Thank you.

I have inspected the verdict form.  I will now publish the verdict.

We, the jury, find the Defendant, Joel Ruiz, guilty of aggravated sexual abuse as charged in Count 1 of the Indictment.

We, the jury, find the Defendant, Joel Ruiz, not guilty of aggravated sexual abuse as charged in Count 2 of the Indictment.

Dated this 19th day of January 2024, and signed by the jury foreperson, XXXXX XXXXXXXXXXX.

Do any of the parties wish to have the jury polled?

MS. CAREY:  We would like to, Your Honor, please.

MR. MCGINLEY:  No, Your Honor.

THE COURT:  I'm going to poll each of you, which means